UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SMART & ASSOCIATES, LLC d/b/a
SMART BEVERAGE,                                                    Plaintiff,

v.                                              Civil Action No. 3:10-cv-614-DJH-DW

INDEPENDENT LIQUOR (NZ) LTD., et al.,                             Defendants.

* * * * *

**MEMORANDUM OPINION AND ORDER**

This lawsuit involves a business dispute between American and New Zealand companies involved in the production, distribution, and sale of ready-to-drink alcoholic beverages known as "twistee shots."  Plaintiff Smart Beverage Group was the exclusive North American importer and distributor of twistee shots for over three years.  Defendants include the producer of the twistee-shot brand, Independent Liquor (NZ); its holding company, Flavored Beverages Holding Group; and the current exclusive American importer of twistee shots, Independent Distillers USA, a wholly owned subsidiary of Independent Liquor.

The parties' dispute began when Independent Liquor terminated its business relationship with Smart Beverage in December 2009.  Smart Beverage claims that prior to termination, Defendants breached express and implied warranties, as well as the distribution agreement, when Independent Liquor provided Smart Beverage with twistee shots that were either defective, out of rotation, or "short-coded."[1]  Smart Beverage also claims that Defendants breached two confidentiality agreements entered into after Independent Liquor represented that it was interested in pursuing a joint venture with Smart Beverage and therefore needed its proprietary

---

[1] The term "short-coded" refers to product that contained a "Best Before" date of sale that was so imminent that Smart Beverage allegedly was unable to resell the product upon its purchase from Independent Liquor.

business information.  Smart Beverage claims that Defendants took its proprietary, confidential business information and used it to establish Independent Distillers USA to take over the role of exclusive importer from Smart Beverage, in violation of Kentucky's Uniform Trade Secrets Act and the express provisions of both confidentiality agreements.

Defendants have filed a motion for summary judgment seeking dismissal of these claims.[2]  Along with their motion for summary judgment, Defendants have filed objections to certain evidence relied on by Smart Beverage in its opposition to the summary judgment motion.[3]  Both the summary judgment motion and the objections are now fully briefed for consideration by the Court.[4]

This case involves a complicated set of facts revolving around several different entities, their past business transactions, and their attempted joint venture.  The Court will begin by discussing the facts relevant to the plaintiff's claims, including the business relationship between Smart Beverage and Independent Liquor, the various product-defect issues that form the basis of the breach-of-warranty and breach-of-contract claims, and the sharing of confidential business information that forms the basis of the misappropriation claims and breach-of-contract claims. The section immediately following will address Defendants' evidentiary objections.  Finally, the Court will assess each claim addressed by Defendants' motion for summary judgment.

---

[2] Docket No. 88.

[3] D.N. 98.

[4] By order entered September 29, 2015, the Court administratively remanded the summary judgment motion pending resolution of Defendants' objections to evidence offered by Plaintiff in response to the motion.  (D.N. 103)  The Court's order provided for the automatic reinstatement of the summary judgment motion upon resolution of the objections to evidence.  (*Id.*, PageID # 2144)  This memorandum addresses both the objections to evidence and the reinstated summary judgment motion.

## I. BACKGROUND

### A. Business Relationship Between Smart Beverage and Independent Liquor

For three years beginning in 2003, Michael C. Smart worked for Independent Distillers North America, then the United States subsidiary of Independent Liquor, as its vice president of sales.  He reported to General Manager Michael Howard.[5]  During this time, Independent Liquor produced "twistee shots," which are ready-to-drink, flavored alcoholic beverages in single-serving shot cups that contain vanilla cream alcohol on one side and flavored vodka on the other side.  Twistee shots were sold in four-packs and eight-packs with each package containing a "Best Before" date stamp.

In November 2005, the CEO of Independent Liquor died unexpectedly, prompting Independent Liquor to sell its U.S. subsidiary.  Smart offered to buy the remaining unsold inventory of twistees and "rattlesnakes" (another ready-to-drink, alcoholic beverage) if Independent Liquor would make him its exclusive importer to North America for the next three years.[6]  Independent Liquor agreed to this proposal, and the parties entered into a distribution agreement that appointed Smart Beverage as the exclusive U.S. importer and "master distributor" of twistees and rattlesnakes for three years.[7]  Smart Beverage entered into a separate contract with nonparty MHW Ltd. to act as its national distributor to receive product shipments from Independent Liquor, maintain inventory, provide warehouse services, and take and fill orders from Smart Beverage customers.

Subsequently, Flavored Beverages Holding Group became the parent company of Independent Liquor.  About this time, the current CEO of Independent Liquor raised the

---

[5] D.N. 91-3, PageID # 1515–18.  Howard is now Smart Beverage's expert witness.
[6] D.N. 91-3, PageID # 1527; D.N. 91-6, PageID # 1530; D.N. 91-7, PageID # 1536.
[7] D.N. 96-4.

possibility of a joint venture between Smart Beverage and Independent Liquor with the latter purchasing a fifty percent ownership in Smart Beverage.[8]   On March 20, 2008, Smart Beverage and Independent Liquor executed a confidentiality agreement to protect the exchange of business information.[9]   The agreement afforded Independent Liquor access to certain business information of Smart Beverage for the purpose of evaluating a potential joint venture with Smart Beverage or acquiring ownership of Smart Beverage.[10]   The confidentiality agreement defined this business information to include "all information, ideas and material, in tangible and intangible form, formerly, now or hereinafter created, whether by or for the business, which is not generally known to the public and which relates to the past, present or future business, financial condition or standing, customers, suppliers, distributors, plans, hardware, software, or technology of the business . . . ."[11]   Independent Liquor agreed not to use or disclose any confidential business information it acquired without written consent or except as permitted under the written agreement.[12]   The joint venture plans would ultimately be abandoned, and the sharing of confidential business information forms the basis of some of the plaintiff's claims discussed below.

Prior to execution of the first confidentiality agreement, Smart gave a presentation in New Zealand to the new management of Independent Liquor.   In his presentation, Smart revealed Smart Beverage's support network and ownership; its suppliers and products; their terms of shipment; the purchase price that Smart Beverage paid for other ready-to-drink brands; the retail target price point for twistee shots; a pricing analysis and profit statement for each of

---

[8] D.N. 96-1, PageID # 1667–70.
[9] D.N. 96-7, PageID # 1704–06.
[10] *Id.*
[11] *Id.* at PageID # 1720.
[12] *Id.* at PageID # 1721.

4

the three tiers in the distribution chain; the national average retail pricing for twistee shots and competing ready-to-drink beverages; Smart Beverage's 2007 and 2008 sales results by distributor, including the sales volume and dollar revenue for each distributor; its point-of-sale merchandising displays for its product; a proposal for a new twistee 750 ml product; its street sales team program and annual cost structure; its profit and loss statement for calendar year 2008; and profit and loss forecast for the years 2009 through 2012.[13]

After executing the confidentiality agreement, Smart Beverage provided Independent Liquor with additional business information, including prices and incentives offered to Smart Beverage's wholesale distributors on both twistee shots and competing products that Smart Beverage imported.  Smart Beverage also supplied Independent Liquor with its sales history.[14] In July 2008, Robin Campbell and Peter McHugh, of Independent Liquor, met with Smart to discuss the possible joint venture.[15]  Smart Beverage subsequently provided financial records to Independent Liquor's accountants for an audit.[16]  These records included items such as cash on hand, accounts payable, operating expenses and lines of credit for Smart Beverage.   In September 2008, Campbell, Independent Liquor's international business director, requested still more business information as part of its due diligence.[17]  In response, Smart Beverage provided information on its pricing structure, promotions, payment terms for wholesalers, overhead, and budget details.[18]   Smart Beverage also identified its brokers and their fees per case; its

---

[13] D.N. 89-11.
[14] D.N. 96-7.
[15] D.N. 96-10.
[16] D.N. 96-2, PageID # 1676.
[17] D.N. 96-11.
[18] D.N. 96-12.

distributors; its pricing/discounts; its sales promotion budgets; and the fee structure for MHW, Smart Beverage's national distributor and warehouse operator.[19]

In fall 2008, McHugh and Smart exchanged drafts of a proposed employment agreement prepared by McHugh, which Smart understood to set out the terms of his continued employment upon the finalization of the companies' joint venture.[20]  However, that December, Smart learned that Independent Liquor had decided to postpone the joint venture for a year.[21]  Soon thereafter, Independent Liquor e-mailed Smart to confirm a one-year extension of the distribution agreement, with the assurance that the joint venture proposal would be reconsidered at the end of a year.[22]

**B. Issues Concerning Defective and Out-of-Rotation Twistee Shots**

According to Smart, in spring 2009, Smart Beverage was notified by its wholesalers that they had received defective twistee shots with coagulated cream.[23]  Smart maintains that he notifed Independent Liquor of the coagulation problem within twenty-four hours of the notice.[24]  Leanne Byers, the export/import manager for Independent Liquor, arranged to have the suspect twistee shots from the September 2008 production runs tested.[25]  Test results confirmed the coagulation problem.[26]  Ultimately, it was determined that a total of 8,587 cases of defective twistee shots had been shipped to Smart Beverage.[27]  Smart Beverage requested that Independent

---

[19] *Id.*
[20] D.N. 96-13.
[21] D.N. 96-15.
[22] D.N. 96-17.
[23] D.N. 96-2, PageID # 1681–82.
[24] D.N. 96-19, PageID # 1814.
[25] *Id.* at PageID # 1818–19.
[26] *Id.*
[27] D.N. 96-23, PageID # 1878.

Liquor replace all 8,587 cases.[28]  Independent Liquor shipped to Smart Beverage 4,212 cases of replacement twistee shots—4,375 cases fewer than the 8,587 total defective cases.[29]  Smart Beverage claims that as a result, it was forced to issue credits to certain of its customers for the value of the defective product received.[30]  Independent Liquor maintains that while Smart Beverage may have issued such credits, it was Independent Liquor, not Smart Beverage, that ultimately honored the credits.

In September 2009, Smart Beverage agreed to accept 1,136 cases of "short-coded" twistee shots that were nearing their stated "Best Before" date.  Independent Liquor and Smart Beverage agreed that the 1,136 cases would equate to 852 cases of replacement stock.  Smart Beverage maintains that by the time the short-coded product reached its warehouses in the U.S., only 60 days remained before the expiration of the "Best Before" date, which made the 1,136 cases "virtually useless."[31]

During this same time period, Smart Beverage received from Independent Liquor twistee shots that were "out of proper rotation."[32]  In other words, the product was coded with a "Best Before" date that was earlier than the "Best Before" date of other twistee products already offered for sale on the market.  According to Smart Beverage, its clients refused to accept the out-of-rotation product.[33]  Smart Beverage requested that its warehouse, Western Carriers, investigate the situation.  According to Smart, Western Carriers assured Smart Beverage that the

---

[28] D.N. 96-24, PageID # 1885.
[29] *Id.*
[30] D.N. 96-25.
[31] D.N. 96-3, PageID # 1685–86.
[32] D.N. 96, PageID # 1632.
[33] D.N. 96-2, PageID # 1677–78.

warehouse had consistently followed its first-in, first-out policy in filling twistee-shot orders so that any out-of-rotation stock was not due to problems at the warehouse.[34]

According to Smart Beverage, these product-related issues caused the company to fall behind on its payments to Independent Liquor.  Due to the delay in payment, Leanne Byers notified Smart in mid-October 2009 that Independent Liquor would be taking a credit against the replacement product it owed Smart Beverage to account for adverse fluctuation of the exchange rate between the American and New Zealand currencies that occurred during the time that Smart Beverage's account was overdue.[35]   Independent Liquor's CFO, Peter McHugh, later acknowledged that he was unaware of any prior currency exchange rate loss being imposed on a distributor such as Smart Beverage.[36]   The former CFO and current general manager of Independent Liquor, Julian Davidson, likewise acknowledged that no such prior offset had ever been imposed by Independent Liquor due to foreign currency exchange rate fluctuations.[37]   The distribution agreement provided for payment in U.S. currency, and contained no provision referring to offsets or allowances for foreign currency exchange-rate fluctuations.[38]   Smart Beverage maintains that it always paid Independent Liquor invoices in U.S. dollars and that invoices were always stated in terms of U.S. currency.

## C. Abandonment of Joint Venture Plans Between Smart Beverage and Flavored Beverages Holding Group

In August 2009, Flavored Beverages Holding Group hired consultant Bruce Herman to do a "route-to-market assessment" for Independent Liquor's products in the U.S.  Peter Murphy of Flavored Beverages e-mailed Smart that same month to advise him of Herman's role in

---

[34] D.N. 96-2, PageID # 1679–80.
[35] D.N. 96-33, PageID # 1920.
[36] D.N. 96-7, PageID # 1716–17.
[37] D.N. 96-35, PageID # 1924.
[38] D.N. 96-4, PageID # 1692.

identifying business opportunities to grow Flavored Beverages Holding Group's U.S. business.[39] Herman contacted Smart directly to introduce himself and to request business information on Smart Beverage's sales, pricing, distribution, and promotions.[40]

Smart responded by requesting that Flavored Beverages and Herman enter into a confidentiality agreement before any further business information was disclosed.[41] Smart followed up with a proposed confidentiality agreement. Nick Montague, the CFO of Flavored Beverages, executed this second confidentiality agreement on September 7, 2009.[42] Thereafter, Smart began to provide Herman with various business documents, including purchase and shipping history for Smart Beverage and Independent Liquor; Smart Beverage's purchase history for products; Smart Beverage's shipment history to its wholesalers; its twistee-shots price structure with profit margins by customer; its account history for the prior year; and an analysis of the company's strengths, weaknesses, opportunities, and threats prepared by Smart himself.[43]

Herman later acknowledged that the information he requested from Smart was "confidential" and that he would not himself have provided such information to a competitor.[44] In October 2009, Herman asked Smart to provide price structures for new Independent Liquor products that the company wanted to introduce based on Smart Beverage's pricing with its current customers on existing products. Smart provided the information.[45] After receiving it, Herman made a presentation in November 2009 to Peter Murphy of Flavored Beverages.[46] The presentation included 123 pages of information obtained in part from Smart and Smart Beverage.

---

[39] D.N. 96-27, PageID # 1900.
[40] D.N. 96-28, PageID # 1902.
[41] D.N. 96-29.
[42] D.N. 96-30; D.N. 96-31.
[43] D.N. 96-24, PageID # 1881–82.
[44] *Id.* at PageID # 1882.
[45] D.N. 96-35.
[46] D.N. 96-36.

This information included price structures for the ready-to-drink market; importer, wholesaler, and retail and distributor price structures; and estimated profits in the distribution chain.[47] Ultimately, Herman recommended that Flavored Beverages abandon the joint venture proposal and instead establish its own subsidiary to import and market twistee shots and other Independent Liquor products to the United States.[48]

The Flavored Beverages Board of Directors agreed that Smart Beverage would be terminated as the exclusive U.S. importer and distributor for twistee shots and Independent Liquor products.  Independent Liquor incorporated its own subsidiary, Independent Distillers USA, and hired Herman to run the new company in the United States.[49]  Herman later met with Smart to advise him that Independent Liquor was terminating its exclusive importer relationship with Smart Beverage and would operate its own company, Independent Distillers USA, to import and distribute twistee shots.

Herman and Independent Distillers USA immediately began to contact beverage wholesalers and distributors that previously had business relationships with Smart Beverage.[50] Smart does not know, however, what Herman said to any of the prior Smart Beverage distributors that he contacted.[51]  Smart Beverage now alleges that Independent Liquor, Independent Distillers USA, and Flavored Beverages made improper use of Smart Beverage's proprietary, confidential business information in order to immediately enter the U.S. market as an importer/distributor without having to expend the time or money ordinarily associated with the development of a new market.

---

[47] *Id.*
[48] D.N. 96-24, PageID # 1883–84
[49] *Id.*
[50] D.N. 96-3, PageID # 1689; D.N. 96-24, PageID # 1886.
[51] *Id.*

Smart Beverage made its final payment to Independent Liquor in March 2010.[52]   Smart Beverage offset its final payment to Independent Liquor by $124,687.50, an amount that Smart Beverage alleges represents the cost of the approximately 4,300 replacement cases of twistee shots that Independent Liquor refused to provide Smart Beverage.   These circumstances led to both the present lawsuit and the pending motion for summary judgment.

## II. EVIDENTIARY OBJECTIONS

Before the Court takes up each of the claims of the amended complaint, it must address Defendants' objections to the evidence relied on by Smart Beverage in opposition to summary judgment.[53]   Defendants object to paragraphs 5, 8, 9, 11, 12, 13, 14, 15, 16, and 17 of the declaration of Michael Smart.[54]   They also object to the expert report of Michael Howard and his opinions.[55]   Finally, they object to exhibits 5, 10, 13, 14, 16, 18, 19, 20, 22, and 23 of the opposition.   Defendants repeatedly object on grounds of lack of personal knowledge, failure to comply with authentication rules, hearsay, and relevance.   Because the Court concludes that the objections are without merit, they will be overruled.

### A. Personal Knowledge

An affidavit offered to support or oppose a motion for summary judgment "must be made on personal knowledge [and] set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4).   An affidavit that merely sets forth conclusions or opinions without reliance on admissible supporting facts is insufficient to satisfy the requirements of the Rule.   *Buescher v. Baldwin Wallace Univ.*, 86 F. Supp. 3d 789, 800 (N.D. Ohio 2015).   Further, an affidavit that is based merely upon the "belief" of an affiant is not equivalent to an affidavit made upon personal

---

[52] D.N. 96-39.
[53] D.N. 98.
[54] D.N. 96-19.
[55] D.N. 96-38.

knowledge. *Avery v. Norfolk & Western R.R. Co.*, 52 F.R.D. 356, 359 (N.D. Ohio 1971). Such an affidavit will not be adequate to create a genuine issue of material fact. *Id.*; *Cf. Hooks v. Hooks*, 771 F.2d 935, 946 (6th Cir. 1985) (finding opposing affidavit to satisfy the requirements of Rule 56 to the extent it was based on personal knowledge).

When an affidavit is not based on admissible facts or personal knowledge, the affidavit may properly be stricken along with all attached exhibits. *See Ondo v. City of Cleveland*, 795 F.3d 597, 604–05 (6th Cir. 2015). Affidavits that are based upon hearsay likewise fail to satisfy the requirements of Rule 56. *See State Farm Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1988). Such deficient affidavits offered in violation of the Rule may properly be ignored in determining whether a genuine issue of material fact sufficient to require trial exists. *Id.*

Rule 602 imposes similar requirements in a trial setting. A witness is prohibited from testifying to a matter unless the witness is able to establish personal knowledge of the matter. Evidence will be inadmissible "if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *M.B.A.F.B. Federal Credit Union v. Cumis Ins. Soc., Inc.*, 681 F.2d 930, 933 (4th Cir. 1982).

When a witness has direct knowledge of normal company procedures in a specific situation, the witness will be considered to have personal knowledge of such procedures even if the witness was not directly involved in their application. *See United States v. Thompson*, 559 F.2d 552, 554 (9th Cir. 1977). On the other hand, a witness would not be competent to testify about documents that he or she had never seen before, such as statements in a competitor's internal correspondence that the witness had not previously seen. *See In re Folding Carton Antitrust Litig.*, 83 F.R.D. 132, 135 (N.D. Ill. 1979).

**B. Authentication**

Authentication is governed by Rule 901 of the Federal Rules of Evidence.  The proponent must produce evidence "sufficient to support a finding that the item is what the deponent claims it is."  Fed. R. Evid. 901(a).  Testimony of a witness with knowledge, testimony of an expert witness, distinctive characteristics of the item at issue taken together with the circumstances, and opinion testimony that identifies the unique characteristics of the item at issue are examples of sufficient evidence.  Fed. R. Evid. 901(b)(1)–(5).  Evidence that a particular public record was recorded or filed as required by law or is from an office where such items are required to be kept also is sufficient.  Fed. R. Evid. 901(b)(7).

**C. Hearsay**

Hearsay is defined by Rule 801(c) to be an out-of-court statement that a party offers into evidence to prove the truth of the matter asserted in the statement.  Rule 802 provides that hearsay will not be admitted unless the Federal Rules of Evidence, a federal statute, or other rules of the U.S. Supreme Court provide otherwise.  For purposes of the hearsay rule, a statement is an oral or written assertion or nonverbal conduct intended as an assertion.  *United States v. Nezzi*, 492 F. Supp. 464, 468 (E.D. Ky. 1980). The hearsay rule does not exclude extrajudicial statements that are not offered to prove the truth or falsity of the contents, but merely to show that such out-of-court statements were made.  *United States v. Gibson*, 675 F.2d 825, 833–34 (6th Cir. 1982).

There are numerous exceptions to the hearsay rule.  *See United States v. Williams*, 571 F.2d 344, 350 (6th Cir. 1978).  For example, under the provisions of Rule 803(6), records of a regularly conducted activity made at or near the time by someone with knowledge that are kept in the course of a regularly conducted activity of a business, where the making of the record was

a regular practice, will not be excluded if these conditions are shown by the testimony of the record custodian or another qualified witness or by certification that complies with Rule 902.

When the parties stipulate that a particular piece of evidence is an authentic business record subject to Rule 803(6), no independent verification of the authenticity of the signatures is required. *See United States v. Renfro*, 600 F.2d 55, 59 (6th Cir. 1979). When the record custodian or other qualified witness testifies to the requirements of Rule 803(6), the witness need not have personal knowledge of the particular evidence that is contained within the record itself. *United States v. Reese*, 568 F.2d 1246, 1252 (6th Cir. 1977).

## D. Relevance

Pursuant to Rule 401, evidence is relevant when it has any tendency to make a fact more or less probable than it would be without the evidence. Relevant evidence is generally admissible. *See* Fed. R. Evid. 402. Only when the danger of unfair prejudice, confusion, undue delay, or waste of time outweighs the probative value of the evidence will such evidence be subject to exclusion under Rule 403.

Relevance is the initial hurdle to admissibility. *United States v. Marino*, 568 F.2d 1120, 1123 (6th Cir. 1981). It is noteworthy that "heavy reliance is placed on the discretion of the trial judge" when applying Rule 401. *Rhodes v. Michelin Tire Inc.*, 542 F. Supp. 60, 62 (E.D. Ky. 1982). The same broad discretion applies to the application of Rule 403 in weighing the probative value of evidence. *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 217–18 (6th Cir. 1982); *see also United States v. Brady*, 595 F.3d 359, 361 (6th Cir. 1979); *United States v. Reynolds*, 762 F.2d 489, 494 (6th Cir. 1985).

**1. Objections to Smart Beverage's Deposition Transcripts and the Declaration of Michael Smart**

With these basic principles in mind, the Court turns to Defendants' objections. Defendants first claim that Smart Beverage has not properly authenticated the deposition transcripts cited in opposition to the motion for summary judgment.[56] The Court disagrees. Defendants cite no specific authority for the argument that a separate declaration of counsel is necessary. At most, Defendants make a passing citation to Fed. R. Evid. 901. Smart Beverage, in contrast, cites *Alexander v. Caresource*, 576 F.3d 551, 560 (6th Cir. 2009), which states that "to authenticate a deposition excerpt, a party should include the cover sheet . . . and the court reporter certificate." *Id.* at 560 (citing *Orr v. Bank of Am. N.P. & S.A.*, 285 F.3d 764, 774 (9th Cir. 2002)). Smart Beverage has satisfied these requirements. The objection will be overruled.

Defendants object to paragraphs 5, 8, 9, 11, 12, 13, 14, 15, 16, and 17 of the declaration of Michael Smart, which was included as exhibit 19 to Smart Beverage's response brief. The first is a hearsay objection to the portion of paragraph 5 where Smart avers that Smart Beverage was notified by wholesale customers that some twistee-shot products were defective due to coagulation. But this statement is not offered to establish the truth of its contents—i.e., that the twistee shots had coagulated—rather, it is included to establish that Smart received notice of the defect. The Court therefore concludes that no violation of Rule 802 is established. *See United States v. Bello*, No. 3:11-CR-00127-JHM, 2013 WL 2285974, at *5 (W.D. Ky. May 23, 2013).

In their objection to paragraph 8 of the declaration, Defendants assert that Smart lacked personal knowledge of the MHW inventory of Smart Beverage's twistee shots, which showed that 4,021 of the 8,587 cases of defective product remained at MHW's warehouse. This statement also is challenged as being hearsay and lacking in authentication. The Court once

---

[56] *See, e.g.*, D.N. 96-1–96-3; 96-24.

again is compelled to reject these objections.  Smart is the individual who directly requested that MHW take the inventory discussed in paragraph 8.  He therefore obviously had personal knowledge of his own request.  Defendants offer no explanation for their belief that the inventory results are inauthentic.  The inventory results appear to have been printed upon a Western Wine and Warehouse receipt that includes a customer number, date, product description, inventory code, and lot number.[57]  These unique circumstances would appear to rebut any claim that the warehouse receipt is not authentic.  *See* Fed. R. Evid. 901(b)(4).

The handwritten notes that appear on the warehouse receipt, however, would potentially run afoul of Rule 901 if Smart Beverage is unable to introduce admissible evidence as to the circumstances surrounding the creation of these notes on the receipt.  But Smart's electronic correspondence with Leanne Byers of Independent Liquor provides a context for these notations.[58]  This is enough for the Court to deny the objection without prejudice to Defendants to renew the same at trial depending upon further development of the evidence.  As for the hearsay objection, the Court again agrees that the business-records exception of Rule 803(6) applies; thus, the objection will also be overruled.

The Court rejects Defendants' objections to paragraph 9 of Smart's declaration.  This paragraph indicates that 8,587 cases of twistee shots were unsaleable so that once the remaining number of cases in the warehouse (some 4,021 cases) were identified as unsaleable, Smart Beverage was compelled to destroy such cases.  Defendants again object based upon lack of personal knowledge and hearsay.  Their primary objection, however, appears to be the use of the term "unsaleable," which Defendants contend is conclusory.   The Court rejects this characterization as it fails to consider the full context of the evidence, which includes the

---

[57] D.N. 96-19, PageID # 1829.
[58] D.N. 96-20, PageID # 1848–56.

exchange of e-mails between Smart and Byers in which Byers acknowledges the coagulation problem with the 8,587 cases of defective product.[59]  Defendants may elect to dispute the nature and extent of the coagulation problems, but their apparent disagreement with Smart Beverage is not a basis to exclude the contents of paragraphs 8 or 9.  Defendants will have the opportunity to persuade the jury that the 8,587 cases of twistee shots were not unsaleable and that Smart Beverage was not forced to destroy them.

Defendants' objection to paragraph 11 of the declaration relates to Smart's statement that the seven-day notice provision of the distribution agreement was not enforced by Independent Liquor, and in any event, was impractical given Smart Beverage's reliance upon MHW to receive, store, and distribute Independent Liquor's products.  Defendants initially object on grounds of relevance.  The objection is a curious one given that Defendants argue that lack of adequate notice is one basis of several on which to grant them summary judgment.  It is therefore difficult to conclude that the contents of paragraph 11 are irrelevant, or that Smart has no personal knowledge that the seven-day notice provisions were not enforced.  Had the provisions been enforced, presumably Smart would have been one of the first individuals outside of Independent Liquor to be aware of such enforcement.  Thus, no violation of Rule 401 or 602 appears on the face of the record.  The objections to paragraph 11 will be overruled.

The Court also overrules the lack-of-authentication, hearsay, and lack-of-personal-knowledge objections to paragraph 12 of the Smart declaration.  In this paragraph, Smart avers that approximately 4,566 cases of defective twistee shots were shipped to Smart Beverage's wholesalers based on the e-mail correspondence with Independent Liquor, which indicated that 8,587 cases of defective product were shipped to Smart Beverage, less the results of the MWH

---

[59] D.N. 96-19, PageID # 1821.

warehouse inventory that showed 4,021 such cases remaining in the warehouse in May of 2009. Defendants renew their \objections based on lack of authentication, hearsay, and lack of personal knowledge.  The reasons for rejecting these arguments as to the preceding paragraphs of the declaration apply with equal force here.  The documents from which these numbers are taken appear admissible, including the MHW warehouse receipt with the proviso that the handwritten notes thereon may be subject to further scrutiny at a later date absent further explanation of their origin.  Otherwise, no additional discussion is necessary, and the objections to paragraph 12 will be overruled for the same reasons stated above.

Paragraphs 13 and 14 of the Smart declaration address the "out-of-rotation" problem with Independent Liquor products shipped to Smart Beverage in late 2008, with a "Best Before" date prior to the "Best Before" dates on other Independent Liquor twistee-shot products already offered for sale.  Smart, in paragraph 13 of his declaration, indicates that this out-of-rotation problem led Smart Beverage clients to refuse to accept the twistee shots with the earlier "Best Before" date.  Paragraph 14 continues that as a result of these events involving the out-of-rotation product and the defective coagulated product, MHW destroyed approximately 8,709 cases of twistee shots shipped to it by Independent Liquor as being unsaleable.  As before, Defendants base their objections on lack of personal knowledge, hearsay, and lack of foundation. These objections are not well taken.  For example, the record can reasonably be read to indicate that Smart had personal knowledge of the out-of-rotation problem based on his own inspection of the storage warehouse in mid-2009, after he became aware that customers were rejecting the out-of-rotation product.[60]  Such circumstances satisfy Rule 602 and its requirement of personal knowledge.  Likewise, no basis exists to challenge the personal knowledge of Smart with respect

---

[60] D.N. 96-2, PageID # 1679–80.

18

to the destruction of the out-of-rotation twistee shots in August 2010, given that Smart testified that he was the individual who ordered the destruction.[61]   The Court also concludes that although Defendants object based upon Rule 802 and its prohibition against the introduction of hearsay Defendants do not specify which statement they believe violates the hearsay rule.   Accordingly, the objections to paragraphs 13, 14, and 15 are overruled.

Defendants object to paragraph 16 citing lack of personal knowledge, lack of authentication, and arguing that it relies upon hearsay.   In paragraph 16, Smart identifies the cost per case of the 8,709 cases that were allegedly destroyed—a total of $280,342.50—in relation to the sale price for each case of $48, for a total sale price of $418,332.   The difference represents a potential lost profit of $137,689.50 due to the destruction plus the original $280,342.50 payment for the 8,709 cases.   Defendants insist that Smart had no personal knowledge of the cost per case, their sales price, or the lost profit due to the alleged destruction of the cases.   But this argument is unpersuasive.   First, Smart operated Smart Beverage himself out of his home.   He therefore had personal daily involvement in the operation of the business and was not merely a passive investor.   It would hardly be remarkable that the sole owner of a business might know what he paid for the products he sells or the price for which he sells them.   Calculation of the difference is merely a mathematical matter.   While Defendants disagree with the need for the number of twistee-shot cases destroyed, there is no basis under the cited rules to exclude Smart's testimony based upon a lack of personal knowledge, hearsay, or lack of authentication.   And Defendants once again fail to identify the hearsay statement that Smart allegedly relied on in paragraph 16 to calculate his cost, sales price, and lost profit.

---

[61] D.N. 99-3, PageID # 2130–33; D.N. 99-4, PageID # 2136.

Relevance under Rule 401 is the basis for the final objection to paragraph 17.  Defendants argue, in effect, that the issuance of credits by Smart Beverage for defective or out-of-rotation products is unrelated to the question of damages because only upon honoring such credits would Smart Beverage be out of pocket any money.  That logic does not render issuance of the credits irrelevant.  It simply sets up the legal argument that Smart Beverage's proof of damages fails to the extent it relies solely upon the issuance of credits rather than the act of honoring them.  Accordingly, there is no Rule 401 violation with respect to paragraph 17.  Again, the objections will be overruled.

## 2. Objections to Michael Howard's Expert Witness Report

Defendants also object to the expert witness report of Michael Howard found at exhibit 38 to Smart Beverage's opposition.  Howard is Smart's former supervisor, as well as the CEO of Prairie Creek Beverages, LLC, with 25 years of experience in the sale and marketing of alcoholic beverages within and outside the United States.[62]  Based on his experience and his review of the amended complaint, along with his personal knowledge of Smart Beverage and the market for twistee shots, Howard concludes initially in his expert report that Defendants are not "true brand owners" of twistee shots.  Rather, they are "co-packers" given the absence of the type of market support that is standard in the industry for a true brand owner to provide.[63]  Howard concludes that Smart Beverage would never disclose detailed financials without a specific confidentiality agreement, as it is not standard practice to disclose such proprietary information.  Co-packers, in Howard's view, do not ordinarily receive detailed information concerning "pricing, incentives, budget, overhead and distributor-related payment terms."[64]  Howard concludes that the type of

---

[62] D.N. 96-38.
[63] *Id.*, PageID # 2021.
[64] *Id.*

information disclosed by Smart Beverage to Defendants "is the heart of Smart Beverage's place in the U.S. spirits business."

Because Defendants were not true brand owners, Howard concludes, they would not otherwise have available information on market pricing and programming.  Unlike a brand producer, Defendants were not involved in these areas of Smart Beverage's business.[65] Ultimately, Howard concludes that Smart Beverage provided proprietary information to Defendants, which is not the standard in the U.S. market.[66]  In Howard's view, this proprietary information provided a competitive advantage to Defendants.

Defendants now seek to exclude Howard's expert report in its entirety based upon the requirements of Fed. R. Evid. 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999). Defendants argue that Howard's opinions are inadmissible because he did not have a sufficient factual basis upon which to render such opinions.  They point out that Howard did not review any deposition testimony, written discovery responses, or the full provisions of the distribution agreement.  In their view, the expert report is little more than a series of conclusions on the ultimate legal issue that, absent adequate factual support, are unhelpful and do not preclude summary judgment.

Howard's testimony appears relevant only to Counts V and VI of the complaint, which state the plaintiff's claims for breach of the confidentiality agreements and the misappropriation of trade secrets.[67]  Given the Court's decision to grant Defendants' motion for summary

---

[65] *Id.* at PageID # 2022.
[66] *Id.*
[67] *See id.*

judgment on these claims, *infra* Part IV.E., consideration of Defendants' objections to Howard's opinion testimony is unnecessary at this stage.[68]

### 3. Objections to Smart Beverage's Other Exhibits

The final set of objections involves the exhibits that accompany Smart Beverage's opposition to the summary judgment motion.[69]  Defendants object to exhibits 5, 10, 13, 14, 16, 18, 19, 20, 22, and 23.  Again, the objections are based largely on a supposed lack of relevance under Rule 401, lack of adequate foundation under Rule 602, and lack of authentication under Rule 901.  The Court has previously discussed the standards that apply to all three of these Rules.  Given the nature of the objections and the evidence involved, an extended discussion of the details of each objection is neither necessary nor helpful.

The Court will overrule Defendants' objection to exhibit 5 to Smart Beverage's opposition.  The exhibit is an unexecuted letter agreement between Smart and MHW setting forth the details of the warehousing and distribution agreement between the two companies.  As Smart Beverage points out, it is undisputed that MHW provided both warehousing and distribution services to Smart Beverage during the course of its distribution agreement with Defendants.  Smart has so testified, and the letter agreement merely reflects such testimony.  The topic of the letter is undoubtedly relevant.

The authenticity of the letter does not appear to be in question, given that the document was generated on MHW letterhead.  Further, following the amendment to Rule 56 in 2010, no "unequivocal requirement [exists] that documents submitted in support of a summary judgment motion must be authenticated."  *Abbott v. Elwood Staffing Servs., Inc.*, 44 F. Supp. 3d 1125,

---

[68] If Howard's opinion testimony is offered by Plaintiff at a later time in support of the remaining claims, the Court will consider any objections separately.
[69] D.N. 96.

1134 (N.D. Ala. 2014) (discussing *Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009)).   The proponent of the challenged evidence may cite to materials in the record (e.g., depositions, documents, electronically stored information, affidavits, or declarations) that will satisfy such objection, and only if the evidence cannot be presented in an admissible form, despite reference to such other matters in evidence, will it be subject to exclusion.   *Id*. at 1134 (citing Fed. R. Civ. P. 56, advisory committee's note).   Because Defendants have not established that the letter agreement cannot be admitted as presented when considered along with the other anticipated evidence at trial, this objection will be overruled.

The Court will also overrule Defendants' lack-of-foundation objections as to exhibits 10, 18, 20, 22, and 23.   These objections call into question the need for personal knowledge of a witness under Rule 602.   Because each of the cited objections involves a document, rather than the testimony of a witness, Rule 602 does not appear to be applicable.   Defendants cite no decision which would support a contrary view.   So long as Smart Beverage is able to produce an individual such as Smart who has personal knowledge of each of the documents, the rule will be satisfied to permit introducing each of the documents at issue into evidence.   Such testimony would also satisfy Rule 901.   Because it appears that Smart was directly involved in either the creation or the exchange of each of the documents identified by the above exhibit numbers, and therefore will be able to testify by personal knowledge concerning the circumstances of their creation or exchange, the objections to the cited exhibits will be overruled.[70]

---

[70] The ruling of the Court is not based on Smart Beverage's argument that Rule 602 has no application to documents.   Only if Rule 602 is read in isolation, without consideration of Rule 901, would such a position potentially apply.   Rule 602, however, must be considered in conjunction with Rule 901 when a party raises an objection to a document based on lack of authentication and inadequate foundation.

The Court likewise overrules Defendants' objections to exhibits 13, 14, 16, and 19. These exhibits all involve the joint venture proposal that Defendants explored with Smart Beverage prior to terminating Smart Beverage's exclusive importer relationship. Defendants appear to claim that because no joint venture was ever formalized, the documents are irrelevant under Rule 401. The Court cannot accept this reasoning. Smart Beverage's trade-secrets claim largely depends upon understanding the parties' relationship and why Smart Beverage provided Defendants with all of the business information that it did. Without the introduction of the challenged documents, the jury simply would not understand the situation. The mere fact that a joint venture arrangement was never consummated is not determinative. Accordingly, the objections based on Rule 401 will be overruled.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, first, "a party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 232 (1986) (internal citations omitted); *see also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The movant may do so by merely showing that the nonmoving party lacks evidence to support an essential element of its case for which it has the burden of proof. *See Celotex Corp.*, 477 U.S. at 323. To survive summary judgment, it must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require

submission of the issue to the jury.  *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court will begin by examining the breach-of-warranty claims found in Counts I–III of the amended complaint, followed by the claim in Count IV for breach of contract in relation to the distribution agreement.[71]   The Court will then consider the breach of contract claims concerning the confidentiality agreements found in Count V and the misappropriation claim found in Count VI.[72]   For the reasons set forth below, the Court will deny Defendants' motion as to those claims of breach of warranty and breach of the distribution agreement arising from Independent Liquor's delivery of the 8,587 cases of coagulated twistee shots to Smart Beverage. The Court will grant Defendants' motion as to all other claims.

### A. Breach of Express Warranty

Count I of the amended complaint alleges that Defendants created an express warranty under the terms of the distribution agreement.  This express warranty obligated Defendants to "supply product of marketable quality to Smart Beverage" and further provided that any product not of marketable quality could be "returned for credit."[73]   Smart Beverage claims that Defendants violated this express warranty when they shipped 8,587 cases of defective twistee shots to Smart Beverage and then refused to issue full credit for the unsaleable product, thereby causing Smart Beverage to incur lost profits, storage fees, and the expense of destroying the unsaleable, defective twistee shots.

---

[71] D.N. 70, PageID # 756–59.
[72] *Id.*, PageID # 759–62.
[73] D.N. 89-10, PageID # 1315.

Kentucky law provides that a seller may create an express warranty through (a) an affirmation of fact or promise to the buyer that relates to the goods sold and becomes part of the basis of the bargain; (b) any description of the goods that is part of the basis of the bargain; or (c) any sample or model that is made part of the basis of the bargain.  Ky. Rev. Stat. § 355.2-313(1)(a)–(c).  Here, however, the parties' arguments do not focus on the existence of an express warranty or anyone's reliance upon it.  The April 28, 2006 distribution agreement states in paragraph 7 that "[Independent Liquor] will at all times supply product of marketable quality to Smart Beverage.  Any product not of marketable quality will be returned for credit, provided notification is made to [Independent Liquor] within seven days of receipt of goods."[74]

Thus, the vital question is not whether an express warranty was created by the provisions of the distribution agreement, but what, if any, damages have been established to create a genuine issue of material fact.  Damages for breach of warranty are established by Kentucky statutes, which provide that where a buyer has accepted goods and given notice of a breach of warranty, he may recover as damages "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."  Ky. Rev. Stat. § 355.2-714(1).  "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show approximate damages of a different amount."  Ky. Rev. Stat. § 355.2-714(2); *see Dillon v. Cobra Power Corp.*, 560 F.3d 591, 600 (6th Cir. 2009) (applying Ky. Rev. Stat. § 355.2-714(2)); *Sudamax Industria E Commercio De Sigaros, Ltda v. Butts & Ashes, Inc.*, No. 1:05-CV-60-M, 2007 WL 1035144, at *3 (W.D. Ky. Mar. 29, 2007) (applying Ky. Rev. Stat. § 355.2-714(1)).

---

[74] D.N. 89-10, PageID # 1315.

When evaluating damages and whether genuine issues of material fact have been raised, the Court must consider Kentucky law, which speaks directly to the nature of proof required. *Brundige v. Sherwin-Williams Co.*, 551 S.W.2d 268, 270 (Ky. Ct. App. 1977), was an action for lost profits brought by a former employee of the defendant who had been wrongfully enjoined by his former employer from operating a new retail paint store.  The Kentucky Court of Appeals explained that "the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to its amount and that where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Id.* (quotations omitted).  Accordingly, while damages may not be determined by sheer speculation or guesswork, "it will be enough if the evidence shows the extent of damages as a matter of just and reasonable inference, although the result may only be an approximate one." *Id*. (citing *Flame Coal Co. v. United Mineworkers*, 303 F.2d 39 (6th Cir. 1962)); *see also Gill v. Burress*, 382 SW.3d 57, 63–64 (Ky. Ct. App. 2012) ("[A]ll recoverable damages are subject to some uncertainties and contingencies, but it is generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to the amount.  Where it is *reasonably* certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right to recovery or prevent a jury decision awarding damages.").

Defendants contend that judgment must be entered in their favor on this claim due to the failure of Smart Beverage to adequately establish damages.  Most of the cases of supposedly defective twistee shots, according to Defendants, were actually sold by Smart Beverage to its wholesale distributors.  Smart Beverage has never been able to quantify how many of the allegedly defective 8,587 cases were sold; nor has Smart Beverage ever identified the actual number of cases that it was unable to sell.  Defendants insist that the proof on these two items is

so lacking that any award of damages would be based upon sheer speculation. They point out that while Smart Beverage now claims that it was compelled to issue $168,000 worth of credits to its wholesale clients to compensate them for the coagulated twistees, Smart Beverage conceded that it never honored these credits. Defendants view this concession as absolutely negating the possibility of any damages, particularly where it was Independent Distillers USA that honored Smart Beverage's credits.

Defendants also address the offset that they imposed upon Smart Beverage for fluctuation in the currency exchange rate. They insist that the offset was legitimate and only occurred due to Smart Beverage's undisputed delay in paying eight invoices that totaled some $861,000. Because of this delay, along with fluctuations in the currency exchange rate between the U.S. and New Zealand dollars, Defendants received $268,505 less than would have been paid at the exchange rate as it existed when payment was due. Such fluctuations in currency values, Defendants argue, were an entirely foreseeable consequence of Smart Beverage's delay. Defendants conclude that the value of the offset combined with the credits paid by Independent Distillers USA negates any possible damages.

Smart Beverage argues that a genuine issue of material fact exists regarding the damages incurred due to the 8,587 cases of coagulated twistee shots. Smart Beverage argues that it is not required to calculate its damages with mathematical precision in order to establish a triable issue of fact; rather, it need only show a reasonable basis for its approximate damages for the matter to be put before a jury. Because Independent Liquor replaced only 4,212 cases of the 8,587 cases of spoiled product, simple math establishes that 4,375 cases were not replaced. Further, as of May 2009, MHW confirmed that at least 4,021 cases remained in its warehouses. Calculation of

28

damages therefore is mostly a matter of numerical calculations and credibility determinations by the finder of fact.

Smart Beverage calculates that given the average sale price per case of twistees of $48 less the average cost per case of $32.50, it lost $15.50 of profit per unsold case of defective twistee shots, as well as the original purchase cost of the unreplaced, unsold cases.  The mere fact that the parties disagree over the exact number of such cases confirms in Smart Beverage's view the existence of a genuine issue of material fact that precludes entry of summary judgment for Defendants on the breach of express warranty claim contained in Count I of the amended complaint.

After careful consideration of the record and arguments, the Court concludes that the uncertainty that exists in the present case does not run to the existence of damages flowing from the 8,587 cases of defective twistee shots delivered to Smart Beverage, but rather to the existence of lost profits, a question on which the parties have provided conflicting proof.  This conclusion is confirmed at least in part by a concession in Defendants' reply, which appears to acknowledge that certain distributors were refunded in either cash or replacement product by Smart Beverage.[75] These distributors identified by Defendants include Ollinger, RNDCKY, Lipman Bros., and Beverage Control.   Smart Beverage therefore appears to have at least partially honored its issued credits or made cash payment to the named distributors above.  In either event, the Court simply cannot say that no genuine issue of material fact exists as to the amount of damages that Smart Beverage incurred based on its receipt of the 8,587 cases of coagulated twistee shots.  The question is one for the jury.

---

[75] D.N. 97, PageID # 2063.

## B. Implied Warranty of Merchantability

The next claim to be considered is Smart Beverage's claim for breach of implied warranty of merchantability under Ky. Rev. Stat. § 355.2-314, contained in Count II of the amended complaint.[76]  Smart Beverage alleges that Defendants breached this implied warranty of merchantability in two ways: first, by shipping 8,587 cases of coagulated twistee shots, and second, by shipping cases of twistee shots that were out of proper rotation.  Smart Beverage maintains that it suffered lost profits, storage fees, and the cost of destroying the unsaleable cases as a result of these events.

Defendants take the same position with regard to Count II of the amended complaint as they did with regard to Count I: they argue that Smart Beverage has failed to produce sufficient proof that it suffered any damages.  Defendants further note that Smart Beverage never provided notice to Independent Liquor of a problem with out-of-rotation stock.   Consequently, Independent Liquor had no opportunity to reclaim the stock in an effort to mitigate its losses by attempting to resell the out-of-rotation stock in another, more accepting market.  Because Smart Beverage did not give notice of its rejection within a reasonable time after delivery, Defendants claim that (1) they lost the opportunity to cure and (2) Smart Beverage's actions constituted an acceptance under Ky. Rev. Stat. §§ 355.2-605(1)(a) and 355.2-606(1)(c).

 Defendants also maintain, based on paragraph 4.3 of the distribution agreement, that Smart Beverage failed to establish that the 7,500 cases of twistees at issue became out of rotation prior to the time they left the docks in New Zealand.  The distribution agreement expressly provides that the risk of loss passes to Smart Beverage at the time the goods are delivered free on board to the vessel for shipment from the wharf of departure.  Defendants insist that Smart

---

[76] D.N. 70, PageID # 756–57.

Beverage failed to submit proof from which a reasonable jury could find that the rotation problem arose prior to the risk of loss passing to Smart Beverage.  Thus, Defendants maintain that they are entitled to summary judgment on the warranty-of-merchantability claim based on the out-of-rotation stock.

All sales contracts between a merchant of goods of that kind and the purchaser in Kentucky carry an implied warranty of merchantability regarding the goods sold.  Ky. Rev. Stat. § 355.2-314(1).  Unless an implied warranty is excluded or modified by the parties, the warranty exists by operation of law that goods shall be merchantable.  *Id.*

To be merchantable, goods are required to (a) pass without objection in the trade under the contract description; (b) be of fair average quality within the description in the case of fungible goods; (c) be fit for the ordinary purposes for which such goods are used; (d) run within the variations permitted by the agreement; (e) be adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or acclamations of fact made on the container or label.  Ky. Rev. Stat. § 355.2-314(2)(a)–(f).  An implied warranty may also be created by the parties' course of dealing or by usage of trade.  *See* Ky. Rev. Stat. § 355.2-314(3).

A violation of the implied-warranty provisions of § 355.2-314 does not require a plaintiff to establish reliance, as liability for breach arises automatically by operation of law.  *Overstreet v. Norden Laboratories, Inc.*, 669 F.2d 1286, 1289 (6th Cir. 1982).  Nonetheless, privity of contract must exist between the parties in order for one to successfully rely upon the implied warranty of merchantability.  *Levin v. Trex Co., Inc*., No. 3:10-CV-692-CRS, 2012 WL 7832713, at *1–2 (W.D. Ky. Mar. 5, 2012) ("We hold that without a direct buyer-seller relationship, plaintiff's claim for breach of implied warranty against defendant fails as a matter of law."); *Roberts v. Solideal Tire, Inc.*, No. 06-14-DLB, 2007 WL 2990536, at *2 (E.D. Ky. Oct. 10,

2007) (finding privity required for breach of warranty, breach of implied warranty, and breach of implied warranty of fitness for a particular purpose).

The language of the express warranty contained in paragraph 7 of the distribution agreement does not exclude or modify any implied warranty of merchantability that might arise under Ky. Rev. Stat. § 355.2-314(1), nor is its language inconsistent with the provisions of the statute.  To the contrary, the language directly parallels the purpose of § 355.2-314 to the extent that it requires Defendants to "supply product of marketable quality to Smart Beverage."  This language seems to expressly incorporate into the parties' contract the statutory requirement that the twistee shots be of fair and average quality within the contract description.

The Court concludes that Defendants are entitled to summary judgment as to Smart Beverage's claim concerning the 7,500 cases of out-of-rotation stock.  Smart Beverage accepted this stock without objection.  Consequently, Independent Liquor was never given pre-litigation notice by Smart Beverage of any possible issue with this stock that would afford Independent Liquor the opportunity to mitigate its damages.  Once goods are accepted, Ky. Rev. Stat. § 355.2-601(1) dictates that the buyer "must pay at the contract rate for any goods accepted."  Acceptance of goods by the buyer precludes their rejection, and if made with knowledge of the nonconformity, cannot be revoked, though acceptance does not impair the buyer's ability to pursue other statutory remedies.  *See* Ky. Rev. Stat. § 355.2-607(2).

Defendants are entitled to summary judgment based on the express language of the distribution agreement itself.  Paragraph 4.3 states:

> Risk in the products shall pass to Smart Beverage at the time they are delivered free on board the vessel for shipment from the wharf of departure unless the goods are shipped on a CIF[77] basis in which case risk

---

[77] Cost, insurance, and freight.

shall pass upon arrival at the wharf in the USA.  Title to the goods will pass on payment.[78]

This language reveals that Smart Beverage, not Defendants, bore the risk that it would receive out-of-rotation stock once the 7,500 cases of twistee shots were loaded onboard the shipping vessel in New Zealand.  The only proof submitted by Smart Beverage with respect to whether the goods were out of rotation at a particular time is found in the communications from Western Carriers, which advised Smart that the warehouse followed its first-in-first-out policy with respect to distribution of the product.  This evidence does not satisfy Smart Beverage's burden to establish that the out-of-rotation problem arose prior to the time that Smart Beverage contractually assumed the risk of loss.  Put differently, the assurance of Western Carriers that it did not get the stock out of rotation does not permit Smart Beverage to avoid the very risk it contractually assumed by operation of paragraph 4.3 of the distribution agreement.  Absent any proof, direct or circumstantial, that the rotation problem arose prior to shipment from the dock of departure, Smart Beverage is precluded as a matter of law under the express terms of the parties' distribution agreement from any recovery on this particular aspect of its suit.[79]

Nothing in the applicable statutes prevents a contracting party from consciously assuming the risk of a particular contingency.  *See generally Teco Coal Corp. v. Orlando Utils. Comm'n*, No. 6:07-CV-444-KKC, 2010 WL 8750622, at *9 (E.D. Ky. Sept. 17, 2010) (discussing a seller's assumption of the risk in the context of a claim of commercial impracticability arising under Ky. Rev. Stat. § 355.2-615); *see also Cohen v. Northridge Farms, Inc.*, 712 F. Supp. 1265, 1270–71 (E.D. Ky. Mar. 29, 1989) (noting that it is possible for a party to a contract to assume the risk of every chance occurrence).  Such a provision shifts the risk of loss to the buyer

---

[78] D.N. 89-10, PageID # 1314 (footnote added).

[79] D.N. 96-2, PageID # 1679.  Smart conceded upon questioning that he did not know when the three containers of product got out of rotation.

irrespective of any express or implied warranties.  *See Roberts v. Lanigan Auto Sales*, 405 S.W.3d 882, 884–85 (Ky. Ct. App. 2013) (discussing assumption of the risk in the context of "as is" clauses under Ky. Rev. Stat. § 355.2-316).  Indeed, the parties are afforded broad discretion to enter into an agreement that provides for remedies in addition to, or in place of, those available under the statute and may limit or alter the measure of damages recoverable.  *See* Ky. Rev. Stat. Ann. § 355.2-719(1)(a).  Because Smart Beverage agreed to assume the risk of out-of-rotation stock once it was shipped from New Zealand, and because Smart Beverage offers no proof that the stock came out of rotation prior to the time of such shipment, the provisions of the distribution agreement preclude Smart Beverage as a matter of law from recovering any damages allegedly related to the rotation problem with the 7,500 cases of twistee shots.

## C. Implied Warranty of Fitness for a Particular Purpose

Defendants also seek summary judgment with respect to Count III of the amended complaint.  This count asserts a claim for breach of implied warranty of fitness for a particular purpose under Ky. Rev. Stat. § 355.2-315.  The statute provides that if a seller has reason to know at the time of contracting of any particular purpose for which the goods are required, and the buyer is relying on the skill or judgment of the seller to furnish suitable goods, then an implied warranty that the goods shall be fit for that particular purpose arises unless it is excluded or modified by the parties according to Ky. Rev. Stat. § 355.2-316.

The amended complaint alleges that the delivery of the 8,587 cases of coagulated twistee shots violated the implied warranty of fitness for a particular purpose.  Smart Beverage makes the same allegation with respect to the 7,500 cases of out-of-rotation stock and as to the previously mentioned "short-coded" stock with an impending "Best Before" date that prevented its sale.  Smart Beverage seeks to recover lost profits, expenses of destruction, and storage fees.

34

In their motion for summary judgment, Defendants argue that by its very language § 355.2-315 cannot apply.  Twistee shots, Defendants explain, are fungible, branded, consumer products that are not sold for any "particular purpose," but rather are sold in their entirety for the ordinary purpose for which such goods are intended—that is, to be consumed by adults as alcoholic beverages.  Accordingly, Defendants conclude that § 355.2-315 has no application to the coagulated twistee shots, the out-of-rotation stock, or the short-coded stock—all of which were sold for their ordinary purpose and for no other reason.

Smart Beverage counters that such arguments are misleading.  It asserts that a twistee shot is a dairy-based alcoholic beverage that is "highly specialized relative to other alcoholic beverages."  Accordingly, the "particular purpose" within the meaning of § 355.2-315 was the obligation of Defendants, as sellers, to provide a specialized product to customers and Smart Beverage relied on Defendants' expertise in this respect, to its detriment.  At a minimum, Smart Beverage concludes that there are material issues of fact due to the specialized nature of the twistees, which fall within the statutory definition of § 355.2-315.

The Court disagrees.  A plaintiff who seeks to recover under Ky. Rev. Stat. § 355.2-315 based upon a defect in a product must show more than that the product was used for its ordinary purpose.  *See Dalton v. Animas Corp.*, 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012) (finding claim for breach of implied warranty of a fitness for a particular purpose failed where plaintiff showed nothing more than that she used insulin pump for its ordinary purpose).  Before a plaintiff may recover under § 355.2-315, he or she must establish two general facts:  first, that the seller was aware at the time of the contract that the buyer had intended a particular purpose for the goods; second, that the buyer relied on the skill or judgment of the seller to supply goods suitable for that particular purpose.  *Travelers Prop. Cas. Co. of Am. v. Rapid Power Corp.*, No. 5:12-CV-

00038-R, 2013 WL 1898833, at *8 (W.D. Ky. May 3, 2013) (citing *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir. 1981)).

The court applied these requirements in *Bland v. Abbott Laboratories, Inc.*, No. 3:11-CV-430-H, 2012 WL 32577 (W.D. Ky. Jan. 6, 2012). In *Bland*, parents of an infant claimed breach of implied warranty of fitness for a particular purpose under § 355.2-315 following the recall of Similac formula prompted by the discovery of dead beetles in boxes of finished product at the production plant. *Id.* at *2. The district court granted summary judgment, explaining that the plaintiffs used Similac for its ordinary purpose—feeding an infant. *Bland*, 2012 WL 32577, at *2. ("Absent an allegation plaintiffs had a particular purpose that Abbott would have reason to know, this claim must be dismissed.") Therefore, their claim was for breach of warranty of merchantability, not fitness for a particular purpose. *Id.*

The same reason that compelled dismissal in *Bland* applies to Smart Beverage's claims in Count III of its amended complaint. Nowhere does Smart Beverage allege a particular purpose in its amended complaint, nor does Smart Beverage in its opposition to summary judgment explain what particular purpose existed that would put its allegations within the purview of § 355.2-315. Nothing in the record indicates that the twistee shots sold by Defendants were to be used for anything other than their ordinary purpose—consumption by adult beverage-drinkers. Accordingly, Defendants are entitled to judgment as a matter of law on Count III of the amended complaint given the failure of Smart Beverage to satisfy the requirements of the statute.

**D. Breach of Contract**

In Count IV of its amended complaint, Plaintiff alleges that Defendants breached the distribution agreement by shipping 8,587 cases of defective, coagulated twistee shots and failing to honor their contractual promise to fully refund or replace this unsaleable product after

receiving timely notice of the defect.  Smart Beverage points to the distribution agreement language that imposed an obligation on Defendants "at all times [to] supply product[s] of marketable quality to [Smart Beverage]."[80]  Smart Beverage alleges that it provided proper notice of the coagulation defect to Defendants, who, despite their contractual obligation to provide full credit, only replaced fifty percent of the spoiled twistee shots.  Smart Beverage further alleges that Defendants provided no refund or replacement products for the out-of-rotation stock, which also was allegedly unmarketable.

The Court previously considered the breach-of-warranty claims of Smart Beverage as they relate to the cases of coagulated twistee shots, concluding that genuine issues of material fact exist.  The Court reaches the same conclusion with respect to Smart Beverage's breach-of-contract claim.  Paragraph 7 of the distribution agreement required Defendants to provide products of marketable quality.  The coagulated twistee shots failed to satisfy this requirement.  Thus, as before, the focus of the parties' dispute falls upon the appropriate measure of damages.  The Court therefore concludes that summary judgment is inappropriate on Smart Beverage's claim for breach of contract arising from the coagulated product shipped by Defendants.

Smart Beverage separately alleges in Count IV that Defendants breached the distribution agreement by unilaterally imposing a currency exchange rate credit to offset the replacement product owed to Smart Beverage.  Smart Beverage maintains that the distribution agreement provided no basis for the imposition of such a credit.  The agreement instead provided in its pricing and credit term: "Prices for goods supplied CIF $44.00 200ml and $29.00 100ml per case as stated in the First Schedule. . . Pricing will be reviewed every six months. . . ."[81]  The first schedule, Smart Beverage points out, expressly stated that payment was CIF prices and U.S.

---

[80] D.N. 96-4, PageID # 1692.
[81] D.N. 89-10, PageID # 1315.

dollars.[82]   Smart Beverage argues that based on this contractual language, Defendants' unilateral decision to impose the $124,687 currency exchange rate credit violated not only the express language of the parties' distribution agreement, but also their course of dealing as set forth in §§ 355.1-303(1)(a) and (b).

In response, Defendants insist that the application of currency rate fluctuation offset was appropriate.  As a result of Smart Beverage's delay in paying for the 4,375 cases, Defendants explain, the value of the payment was reduced due to the weakening of the U.S. dollar against the New Zealand dollar.  Had Smart Beverage paid the eight outstanding invoices totaling $861,770 within 90 days as required under the contract, Defendants would have received $1,427,307 NZD.  Instead, during the delay, currency fluctuations caused the value of the U.S. dollar to drop and Defendants received only $931,960 NZD.

Defendants argue that this decline in the currency value of the dollar was a foreseeable consequence of Smart Beverage's delay in honoring its contractual payment obligations.  Citing *Walther & CIE v. USTD & Guarantee*, 397 F. Supp. 937 (M.D. Pa. 1975), they conclude that their imposition of the currency exchange rate credit was not a violation of the contract and was appropriate under the circumstances.  Alternatively, Defendants maintain that any potential damages due Smart Beverage for breach of contract are more than offset by Defendants' own losses, given the credits honored by Independent Distillers USA that Smart Beverage issued but did not itself honor and the exchange rate losses due to Smart Beverage's belated payment of the eight invoices.

As for the credit imposed by Defendants due to the fluctuation in the exchange rate between the U.S. dollar and the New Zealand dollar, there appears to be no specific language in

---

[82] D.N. 70, PageID # 759.

the contract that would permit Defendants to unilaterally impose such a credit to offset their obligation to make good on the remaining 4,375 cases of coagulated twistee shots.  The Court is unable to determine from the record exactly how many of these 4,375 cases were sold by Smart Beverage, and how many of these sales were later offset by credits that were both issued and honored by Smart Beverage, as opposed to those credits that ultimately were honored by Independent Distillers USA.  Thus, genuine issues of material fact exist as to these questions.  Such issues preclude the Court from disposing of the breach-of-contract claim involving the coagulated twistees as a matter of law to the extent that Defendants rely on a currency exchange rate fluctuation offset to reduce their potential liability.

Defendants' argument finds no support, however, in the contract language of the parties' distribution agreement and inadequate support in *Walther & Cie*, which involved a settlement agreement expressly conditioned in part on the timely delivery of a promissory note by an American defendant to a German plaintiff.  397 F. Supp. at 940.  The *Walther & Cie* court concluded that the loss due to the fluctuation of the currency exchange rate due to late delivery of the note was a form of damages that was not only reasonably foreseeable, but was itself within the contemplation of the parties to the agreement.  *Id.* at 945.  Here, by contrast, it does not appear that such an offset was within the contemplation of either party to the distribution agreement, particularly given that Independent Liquor had never previously imposed such an offset on any of its importers or distributors.  Thus, the calculation of damages potentially due Smart Beverage cannot be automatically reduced by the currency exchange rate fluctuation as Defendants maintain. A jury will have to sort out this matter.

The Court reaches a different conclusion with respect to the "short-coded" product that Smart Beverage knowingly accepted at a substantial discount as part of Defendants' obligation to

replace the coagulated twistee shots.  Smart Beverage agreed to receive 1,136 cases of short-coded stock with the understanding that these cases would be the equivalent of 852 cases of replacement stock for the defective twistees.  In other words, Smart Beverage received an additional 284 cases of twistee shots as part of its bargain for accepting product that it knew had a closer "Best Before" date.

As Defendants correctly point out, Smart Beverage has presented no evidence that any of the cases had passed their "Best Before" date when it knowingly entered into this bargain.  Likewise, Smart Beverage offers no evidence that Defendants unreasonably delayed shipping the short-coded stock.  And critically, Smart admitted during his deposition that Smart Beverage is not seeking damages for the short-coded stock.[83]  Smart acknowledged that Smart Beverage should have made additional efforts to market the short-coded stock more quickly.[84]  In other words, the problem was not that the stock had an imminent expiration date, or "Best Before" date, which Smart Beverage was well aware of, but that Smart Beverage failed to market effectively the time-sensitive beverages.  Because Smart Beverage knowingly received the short-coded twistee shots, Defendants are entitled to summary judgment on Smart Beverage's claims.

### E. Breach of Confidentiality Agreements and Misappropriation of Trade Secrets

Counts V and VI of the amended complaint outline Smart Beverage's claims that Defendants violated the confidentiality agreements of March 2008 and September 2009, as well as Kentucky's Uniform Trade Secrets Act (UTSA), Ky. Rev. Stat. Ann. § 356.880, *et seq*.[85]  Smart Beverage claims that Defendants acted in the "guise" of evaluating its business for a potential joint venture.  This subterfuge led Smart Beverage to produce confidential business

---

[83] D.N. 92-7, PageID # 1593 (responding "no" when asked if the short-coded stock is something for which he was seeking damages).
[84] D.N. 99-3, PageID # 2131.
[85] D.N. 89-12; D.N. 90-5.

information, which the confidentiality agreements required to be used solely to evaluate Smart Beverage's potential as an acquisition, or a joint venture partner, of Defendants.  Rather than make such evaluation in good faith, Smart Beverage contends that Defendants took Smart Beverage's confidential business information concerning costs, pricing, profits, and sales history and misused it to establish its own distribution company in the United States, Independent Distillers USA, after abruptly terminating Smart Beverage's relationship as exclusive importer and distributor.  Smart Beverage claims that as a result of the breach of the confidentiality agreements, it suffered lost profits, storage fees, and expenses for the destruction of unsaleable twistee shots.

In Count VI of the amended complaint, Smart Beverage contends that it provided confidential information to Defendants, who were supposedly engaged in due diligence to determine the possibility of a joint venture.  As part of a "route-to-market" review, Smart Beverage provided Bruce Herman with confidential business information that constituted trade secrets within the meaning of § 1 of the UTSA, Ky. Rev. Stat. § 356.880(4).  This information, according to Smart Beverage, included financial records such as cash on hand, accounts receivable and payable, price structures for customers, sales history of Independent Liquor products as well as competitors' products, and special incentive plans given by Smart Beverage to its preferred customers.

Smart Beverage now insists that none of the above information was generally known, nor was it readily ascertainable.  Smart Beverage alleges that it derived economic benefit from this business information and made reasonable efforts to protect it from unnecessary disclosure, such as the execution of two confidentiality agreements with Defendants.  Smart Beverage claims that Defendants improperly used its trade secrets in a surreptitious effort to develop, incorporate, and

operate Independent Distillers USA.  It maintains that this misappropriation of trade secrets allowed Defendants to quickly and inexpensively take over Smart Beverage's North America market without having to expend the amount of time, money, and effort that would otherwise have been required.

Defendants' actions, according to Smart Beverage, constitute misappropriation in violation of the UTSA, Ky. Rev. Stat. § 365.880(2)(a).  Accordingly, Smart Beverage alleges that it is entitled to recover damages under § 2 of the UTSA, Ky. Rev. Stat. § 365.884, as measured by profits lost from its inability to continue to distribute twistee shots to its former customers, along with damages for unjust enrichment that Defendants enjoyed as a result of their misappropriation of trade secrets.  Because this misappropriation was willful, Smart Beverage asserts it is entitled also to recover exemplary damages under § 3 of the UTSA, Ky. Rev. Stat. § 365.884(2).

The UTSA, by operation of Ky. Rev. Stat. § 365.892, replaces all conflicting tort and other state law that provides civil remedies for the misappropriation of a trade secret.  The Act does not, however, affect remedies agreed upon by parties to a contract, whether or not based on the misappropriation of a trade secret.  Ky. Rev. Stat. § 365.892(2)(a)–(b).  The UTSA provides a civil remedy for misappropriation of trade secrets, but only if the plaintiff first can show that the information misappropriated qualifies as a trade secret under the statutory definition; and second, that the defendant misappropriated such information.  *Id*.  Under § 365.880(4), a trade secret is defined as information that derives independent economic value, either actual or potential, from not being generally known or readily ascertainable by proper means to other persons who could obtain economic value from its disclosure or use.  Ky. Rev. Stat. § 365.880(4)(a).  Under the same subsection, the definition of trade secret also requires that the

42

owner of the trade secret make reasonable efforts under the circumstances to maintain its secrecy. *Ky. Farm Bureau Mut. Ins. Co. v. Hopper*, No. 2002 SC-0774-MR, 2003 WL 22415748, at *4 (Ky. Oct. 23, 2003); *see also Autochannel v. Speedivision Network, LLC*, 144 F. Supp. 2d 784, 795 (W.D. Ky. 2001) ("To prevail under KUTSA, Plaintiffs must show both misappropriation and that the information misappropriated qualifies as trade secrets under KUTSA.").

A failure in either respect will result in dismissal of the claim as a matter of law. *Autochannel, Inc.*, 144 F. Supp. 2d at 795. If the alleged trade secret is readily ascertainable through proper means, irrespective of the efforts of the plaintiff to keep the information confidential, then it does not satisfy the statutory definition. *Id*. (citing *West. Med. Consultants, Inc. v. Johnson*, 80 F.3d 1331, 1337 (9th Cir. 1996) (holding that information compiled from generally known and accessible sources does not qualify for protection under Oregon's version of the UTSA).

Further, a plaintiff who publishes or otherwise makes available information asserted to be a trade secret, thereby making it readily ascertainable to many people through proper means, will likewise fail to satisfy the two-part test under § 355.880(4). *Id.*, 144 F. Supp. 2d at 795 (plaintiff's promotional publications of concept for a cable channel dedicated to automotive enthusiasts and wide distribution of pilot episodes transformed the allegedly protected trade secrets into information readily ascertainable by the public removing it from the Kentucky statutory definition of trade secret). The complete failure of a plaintiff to require the party receiving disclosure to enter into a confidentiality agreement to protect the alleged trade secrets has been held to be "one clear way to waive any trade secret protection that might exist." *BDT Prods., Ltd. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 891 (E.D. Ky. 2003), *aff'd* 124 F. App'x.

329 (6th Cir. 2005) (plaintiff could not establish that information constituted a trade secret where plaintiff disclosed all of its alleged trade secrets to defendant over the course of a year without securing protection for the disclosure, thereby failing to take reasonable steps to maintain secrecy). Waiver also occurs if the disclosing party enters into an agreement but places few or no restrictions on the uses a third-party may make of the alleged trade secrets. *Id.*

Even when a plaintiff is able to establish the existence of a trade secret under Ky. Rev. Stat. § 365.880(4), the plaintiff still must prove that the defendant misappropriated the trade secret for its own beneficial use without the plaintiff's express or implied consent. *Id.* at 893–94. Information that is readily obtainable by proper means, such as a customer list that is known to the industry, or that may be obtained through legitimate channels, such as from an internet search or by calling on local businesses, is not a protected trade secret. *ATC Dist. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005); *see also UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 447 (W.D. N.C. 2002) (holding that brokerage firm's customer lists were not protected trade secrets despite efforts to keep them secret where information in lists was readily ascertainable through independent means).

Whether a particular type of information constitutes a trade secret is a question of fact. *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 671 (E.D. Ky. 2009) (citing *KCH Servs., Inc. v. Vanaire, Inc.*, No. 05-777-C, 2008 WL 4401391, at *2) (W.D. Ky. Sept. 24. 2008)). Business information such as pricing and customer sales information may constitute a protected trade secret under the UTSA where such information is not publicly known or otherwise ascertainable by proper means. *Id.*; *Cmty. Ties of Am., Inc. v. NDT Care Servs., LLC*, No. 3:12-CV-00429-CRS, 2015 WL 520960, at *11 (W.D. Ky. Feb. 6, 2015) (holding that plaintiff's client files, client list, and employee files were trade secrets where they were kept under "double lock and

key" and confidentiality agreements specifically required employees not to take or reveal such information upon termination of their employment).

Finally, when applying the requirements of Ky. Rev. Stat. § 365.880, "no one factor is determinative." *Id.* Whether a party has made reasonable efforts to protect the confidentiality of an alleged trade secret is a question of fact. *Niemi v. NHK Spring Co. Ltd*, No. 07-3536, 2008 WL 4273123, at *8 (6th Cir. Sept. 19, 2008).

To determine whether a defendant misappropriated a trade secret, the plaintiff must provide evidence from which a reasonable jury could decide that Defendants obtained the otherwise protected information by improper means or used it without consent. *Autochannel, Inc.*, 144 F. Supp. 2d at 796. The mere possession of an otherwise protected trade secret without any use does not constitute misappropriation within the meaning of the UTSA. *Vanwinkle v. HM Ins. Grp., Inc.*, 72 F. Supp. 3d 723, 736–37 (E.D. Ky. 2014).

Examination of the extensive record persuades the Court that Defendants are entitled to summary judgment in their favor on Smart Beverage's claims for violation of the UTSA and for breach of the two confidentiality agreements. Smart Beverage has failed to satisfy the statutory elements of the UTSA in several material respects. Smart Beverage has not produced satisfactory proof that the great bulk of the information it disclosed falls within the definition of a "trade secret" under § 365.880(4)(a). Most if not all of the confidential information concerning Smart Beverage was either generally known or otherwise readily ascertainable by proper means.

Prior to the execution of the March 2008 confidentiality agreement, Michael Smart traveled to New Zealand that same month and gave a presentation to the Defendants identifying all of Smart Beverage's customers and revealing Smart Beverage's sales results that year by

45

volume, revenue, customer, and state.[86]   Consequently, the identities of its wholesale distributors were fully disclosed prior to the execution of the initial confidentiality agreement.   In fact, Smart Beverage concedes that prior to March 2008 it publicly disclosed the identities of its distributors on its website.   Accordingly, this information was publicly available, and the subsequent efforts of Independent Distillers USA to contact Smart Beverage's former wholesale distributors did not involve the misappropriation of a trade secret under § 365.880.

During the same March 2008 presentation, Smart also revealed detailed financial information about the operations of Smart Beverage.   For example, Smart Beverage provided its profit and loss statement for 2008.   The P&L statement contained an exact accounting of Smart Beverage's total income from sales and gross receipts, as well as its cost of goods sold and resulting gross profit.   The P&L statement also revealed the company's expenses by category (e.g., auto, bank charges, commissions, labor).   And it used these items to calculate and reveal total expenses and net income along with total earnings before interest and taxes.[87]   Smart also provided the projected profits and losses for the next four years, 2009 through 2012.   Contrary to Smart Beverage's arguments, this information was not a broad, generalized look at the U.S. ready-to-drink beverage market.   Smart Beverage revealed its financials in detail *prior* to entering any confidentiality agreement.   Because the information was initially made available to Defendants without restrictions, it does not meet the definition of a trade secret, and no misappropriation could have occurred.

The Court likewise concludes that Defendants are entitled to summary judgment on Smart Beverage's claims for breach of the two confidentiality agreements.   Smart Beverage has failed to present proof from which a reasonable jury could find in its favor on those claims.

---

[86] D.N. 92-3, PageID # 579; DN 89-11.
[87] *Id*. at PageID # 1344.

Smart Beverage is left with merely the entry of Independent Distillers USA into the market as its proof of violation of the agreements.  However, prior to its involvement with Smart Beverage in 2006, Independent Liquor had for years imported and distributed ready-to-drink alcoholic beverages in the United States.  Independent Liquor was not a newcomer to the U.S. market. Further, as Smart Beverage's own wholesaler/distributor conceded, much of the information such as profit margins in the distribution chain was generally known and subject to simple mathematical determination.[88]  In other words, once one knows the cost of purchasing twistee shots, the profit margin may be readily determined simply by walking through the facilities of the distributors to determine the price charged while deducting the cost paid.[89]

The record does not contain substantial proof that Defendants disclosed or otherwise used that information when they elected to terminate Smart Beverage's exclusive importer/distributor relationship and to resume directly importing and distributing twistees through their own subsidiary.  Smart Beverage fails to offer sufficient evidence of any alleged misuse of confidential business information by Defendants in the course of establishing Independent Distillers USA.  At most, it offers that Independent Distillers USA's CEO contacted six former wholesale distributors of Smart Beverage.  But as noted above, the identities and locations of the wholesale distributors were a matter of public record.  Overall, there is insufficient proof to put the matter before a jury.

**V. CONCLUSION**

For the reasons set forth above, Defendants' evidentiary objections are **OVERRULED** and Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  The motion is **DENIED** as to those claims of breach of warranty and breach of the

---

[88] D.N. 91-13, PageID # 1560.
[89] *Id.*

distribution agreement arising from Independent Liquor's delivery of the 8,587 cases of coagulated twistee shots to Smart Beverage.  The motion is **GRANTED** as to all other claims.

Summary judgment has been granted as to Counts II, III, V, and VI of the amended complaint.  Counts I and IV remain.  This matter is hereby **REFERRED** to Magistrate Judge Dave Whalin to conduct a status conference to finalize the remaining pretrial schedule.  The parties' joint motion for a status conference (D.N. 104) is **DENIED** as moot.

December 29, 2016

**David J. Hale, Judge**
**United States District Court**

48